```
 1                   IN THE UNITED STATES MAGISTRATE COURT
                   FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                                 AT BECKLEY

 3     _____x
                                        :
 4     UNITED STATES OF AMERICA,         :
                                        :
 5                    Plaintiff,         : Criminal Action No.:
              -vs-                       : 5:23-cr-00188-4
 6                                        :
       CHAD LESTER,                       :
 7                                        :
                      Defendant.          :
 8     _____x

 9

10                   ARRAIGNMENT AND DETENTION HEARING
                   BEFORE THE HONORABLE OMAR J. ABOULHOSN
11                   UNITED STATES MAGISTRATE JUDGE
                        IN BECKLEY, WEST VIRGINIA
12                          DECEMBER 5, 2023

13
       APPEARANCES:
14     For the Government:        CHRISTINE M. SISCARETTI, ESQUIRE
                                  U.S. DEPARTMENT OF JUSTICE
15                                Civil Rights Division
                                  950 Pennsylvania Avenue
16                                Washington, DC 20530

17                                TIMOTHY BOGGESS, AUSA
                                  UNITED STATES ATTORNEY'S OFFICE
18                                Southern District of West Virginia
                                  Suite 4000
19                                300 Virginia Street, East
                                  Charleston, WV 25301
20
       For the Defendant:         KRISTOPHER FAERBER, CJA
21                                Post Office Box 862
                                  Lewisburg, WV 24901
22
       Probation Officer:  Paradise Nelson
23
       Court Reporter:  Amanda J. Pickens, CCR, RPR, FCRR
24
       Proceedings recorded by CourtSmart;
25     transcript produced by computer
```

INDEX

GOVERNMENT'S
WITNESSES                DIRECT    CROSS   REDIRECT   RECROSS   EXAM

G.A. NAPIER                10       21

1              (The following proceedings were held before the

2     Honorable Omar J. Aboulhosn, United States Magistrate Judge,

3     in the case of *United States of America v. Chad Lester,* on

4     December 5, 2023, at Beckley, West Virginia, beginning at

5     3:25 p.m.)

6              THE COURT:  Okay.  The next matter the Court has

7     on the docket is in the matter of the United States of

8     America versus Chad Lester.

9         Case Number 5:23-cr-188-4.

10        Would counsel please note your appearance for the

11    record?

12             MS. SISCARETTI:  Christine Siscaretti for the

13    United States.  And with me is Tim Boggess from the U.S.

14    Attorney's Office.

15             THE COURT:  Thank you.

16             MR. FAERBER:  Good afternoon, Judge.  Kris Faerber

17    on behalf of Mr. Lester.  He's seated to my left.

18             THE COURT:  Thank you.

19        Mr. Lester, would you please stand for me, sir, with

20    your counsel?  Raise your right hand.

21        (The defendant is sworn by the Court.)

22             THE COURT:  Thank you.  Mr. Lester, you're here in

23    court today -- you can put your hand down.  You're here in

24    court today on an indictment that's been returned against

25    you.

```
 1          Counsel, it's my understanding that the defendant was

 2    arrested and had his initial appearance before Judge Tinsley

 3    in Charleston; is that correct?

 4              MR. FAERBER:  Yes, Judge.

 5              THE COURT:  Thank you.

 6        Mr. Lester, you have the right to remain silent.

 7    Anything you say can be used against you.  Do you understand

 8    that?

 9              THE DEFENDANT:  Yes, sir.

10              THE COURT:  Could you tell me your full name,

11    please?

12              THE DEFENDANT:  Chad Dayton Lester.

13              THE COURT:  Mr. Lester, have you received a copy

14    of the indictment in this case?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  Have you had an opportunity to read

17    that indictment?

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  Do you understand the indictment and

20    what you're charged with?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  Okay.  Have you had the opportunity to

23    discuss those charges with your counsel?

24              THE DEFENDANT:  Yes, sir.

25              THE COURT:  Would you like for me to read the
```

```
 1    indictment out loud to you or do you want to waive the
 2    reading of the indictment?
 3                THE DEFENDANT:  No, sir.
 4                THE COURT:  Okay.
 5                THE DEFENDANT:  I want to waive it.
 6                THE COURT:  Thank you.  As to the charge contained
 7    in the indictment, how do you plead, guilty or not guilty?
 8                THE DEFENDANT:  Not guilty.
 9                THE COURT:  Your case has been assigned to
10    District Judge Frank Volk and your trial scheduled for
11    January 23rd, 2024 at 9:00 here in Beckley.  There will be a
12    hearing on any pretrial motions that are held and that will
13    be held on January 4th, 2024, at 1:30 before me in Beckley.
14         Now, the defendant has a right to be present for the
15    hearing on pretrial motions.
16         Mr. Faerber, I assume your client does not wish to
17    waive that right?
18                MR. FAERBER:  He does not wish to waive that,
19    Judge.
20                THE COURT:  Thank you.  You all can be seated.
21                MR. FAERBER:  Thank you.
22                THE COURT:  The Court has received the arraignment
23    order and standard discovery request.  I will enter that and
24    make that part of the record.  As a result of that, the
25    pretrial motions are due by December 28, 2023, jury
```

1    instructions, voir dire questions are due by January 12th,

2    2024 and a witness list is due in chambers by January 16,

3    2024.

4         We'll move on to the detention matter in this case.

5         United States has filed a motion for detention.  They

6    have not asserted a rebuttable presumption.  The probation

7    department's prepared a Pretrial Services Report.

8         Do the parties have any additions or corrections to

9    that report?

10        First on behalf of the United States.

11             MS. SISCARETTI:  No, Your Honor.  The Government

12   has no additions or corrections.

13             THE COURT:  Thank you.

14        On behalf of the defendant?

15             MR. FAERBER:  Judge, top of page 1, it appears

16   that -- it alleges at least he's included in Count 1, at

17   least that's my reading of the report.  I don't think he's

18   actually included in Count 1.

19        Page 2, on -- one, two, three, four, five -- sixth

20   paragraph, the first paragraph stated finances or titled

21   finances.  It lists his property as 292 acres, Judge, and

22   it's actually 192 acres.

23             THE COURT:  Okay.

24             MR. FAERBER:  That's all that we have.  Thank you.

25             THE COURT:  Thank you.

1          Let me take just a moment to review something.

2          All right.  Thank you.  The United States has the

3     burden to establish there are no conditions or set of

4     conditions to reassure his appearance at trial and the

5     safety of others in the community.

6          I will hear any proffer the United States wishes to

7     make, any argument you wish to make or any witnesses you

8     wish to call in this matter.  You may proceed.

9          MS. SISCARETTI:  Thank you, Your Honor.

10         First, the Government would like to make a proffer as

11    to the evidence regarding the charges in this matter.  And

12    then the Government does have a witness it would like to

13    call to testify about the circumstances surrounding this

14    defendant's arrest and transport.

15         THE COURT:  Thank you.

16         MS. SISCARETTI:  I'll first start with the

17    proffer, if I may, Your Honor.

18         THE COURT:  That's fine.

19         MS. SISCARETTI:  With -- regarding the charges

20    against this defendant, Your Honor.  As set forth in the

21    specific details in this 18-count indictment, this defendant

22    is charged with three counts.  To be clear, he is not

23    charged with the underlying assaults that's at issue in

24    Count 1, 2 and 3.  However, Your Honor, as the indictment

25    lays out, this defendant did conspire with other law

1  enforcement officers to obstruct justice and tamper with

2  witnesses in order to cover up the egregious assault that is

3  at issue.  And that was in order to shield fellow

4  correctional officers from liability for their roles in the

5  death of Q.B.

6       And as part of that obstructive conduct that the

7  defendant engaged in, Your Honor, that includes threatening

8  to assault a witness, instructing witnesses to provide false

9  information to state investigators, retaliating against

10  witnesses by giving them bad work assignments and even

11  adding information to other witness's -- false information,

12  Your Honor, to other witness's reports.

13       And the Government notes that as alleged in the

14  indictment, the defendant's obstructive conduct continued

15  until October of this year when he gave false statements to

16  FBI agents during a voluntary interview.  As a result of the

17  indictment that was returned, the defendant is now facing

18  charges -- multiple charges that could result in sentences

19  of up to 20 years.

20       Now, at this point, Your Honor, the Government would

21  like to call a witness regarding the arrest.

22            THE COURT:  You may call your witness.

23            MS. SISCARETTI:  Your Honor, the Government calls

24  Gage Napier.

25            THE COURT:  Can you come up over here for me,

 1    please?  Raise your right hand.

 2         (The witness is sworn by the Court.)

 3         THE COURT:  Have a seat right there.  Please pull

 4    that mike down close to you and state your name and spell it

 5    for the record.

 6         THE WITNESS:  Gage Andrew Napier, G-A-G-E,

 7    A-N-D-R-E-W, N-A-P-I-E-R.

 8         MR. FAERBER:  Judge, just note my objection to

 9    this witness.  We don't have any notice of this and it feels

10    a bit like -- ambushed that we come in here and we're going

11    to be going against a witness that we've not heard of or had

12    any disclosure of any information he may have.  It's not

13    referenced in their motion for detention.  So we would like

14    to note our objection to the witness.

15         THE COURT:  I'll note your objection.  And I'll

16    give you the opportunity after this witness testifies if you

17    believe you need more time and come back for a follow-up

18    hearing.

19         MR. FAERBER:  Thank you, Judge.

20         THE COURT:  I'll give you that opportunity.

21         MR. FAERBER:  I appreciate that.

22         THE COURT:  United States have anything in

23    response to that objection, I should ask?

24         MS. SISCARETTI:  No.  Just to note, Your Honor,

25    that this witness's testimony is limited to the facts and

1  circumstances surrounding the arrest and transporting of the

2  defendant that took place just last week.

3          THE COURT:  Okay.  Thank you.  You may proceed.

4                    **DIRECT EXAMINATION**

5  <u>**BY MS. SISCARETTI**</u>:

6  **Q.**   Good afternoon, sir.

7  **A.**   Good evening.

8  **Q.**   Sir, by whom are you employed?

9  **A.**   Charleston Police Department.

10 **Q.**   What was your most recent assignment with the

11 Charleston Police Department?

12 **A.**   Assigned as a task force officer to the FBI for the --

13 to the Charleston Complex Financial Crimes Task Force where

14 we're responsible for investigating complex fraud, money

15 laundering, public corruption and civil rights violations.

16 **Q.**   So your duties and responsibilities as a task force

17 officer include investigating allegations of civil rights

18 violations?

19 **A.**   Yes.

20 **Q.**   And specifically as a task force officer, were you

21 assigned to work on an investigation into allegations that

22 correctional officers at the Southern Regional Jail used

23 unreasonable force against an inmate by the initials Q.B.

24 who died in SRJ custody on March 1st, 2022?

25 **A.**   Yes.

1    **Q.**   During the course of that investigation, did you become

2    familiar with a person by the name of Chad Lester?

3    **A.**   Yes.

4    **Q.**   Do you see Chad Lester in the courtroom today?

5    **A.**   Yes.

6    **Q.**   Can you point him out and identify him by an item of

7    clothing he's wearing?

8    **A.**   Seated to my right in the orange.

9           MS. SISCARETTI:  Your Honor, may the record

10   reflect the witness has identified the defendant?

11          THE COURT:  It does reflect that, yes.

12   **BY MS. SISCARETTI:**

13   **Q.**   Sir, were you personally involved in the arrest and

14   transport of the defendant?

15   **A.**   No.

16   **Q.**   Have you spoken to law enforcement officers who did

17   conduct the arrest and transport of the defendant?

18   **A.**   Yes.

19   **Q.**   First let me direct your attention to the defendant's

20   arrest.  What day did the arrest take place?

21   **A.**   November 30th.

22   **Q.**   Of this year?

23   **A.**   Yes, ma'am.

24   **Q.**   Who was tasked with arresting the defendant that day?

25   **A.**   The FBI's Pittsburgh S.W.A.T. Team.

1   **Q.**   Were any other law enforcement officers assisting in

2   the operation?

3   **A.**   State police also aided.

4   **Q.**   About what time did they begin to effect the arrest?

5   **A.**   6:00 a.m.

6   **Q.**   And where did they go to effect the arrest at

7   6:00 a.m.?

8   **A.**   Lester Mountain.

9   **Q.**   When the S.W.A.T. Team and the other officers got to

10  Lester Mountain at 6:00 a.m., where did they go first?

11  **A.**   We --

12          MR. FAERBER:  Judge, I'd just object.  He's

13  already testified he wasn't part of that and he doesn't have

14  any personal knowledge to be here testifying as to those

15  matters.

16          THE COURT:  A response?

17          MS. SISCARETTI:  Your Honor, in this setting,

18  hearsay is allowed.

19          THE COURT:  Okay.  I'm going to overrule the

20  objection.  You may proceed.

21          THE WITNESS:  Can you repeat the question?

22          MS. SISCARETTI:  Yes.

23  **BY MS. SISCARETTI:**

24  **Q.**  Can you describe where S.W.A.T. officers and S.W.A.T.

25  -- excuse me -- where S.W.A.T. agents and officers went to

1   when they got to Lester Mountain?

2   **A.**   Yes.  We pulled up to a residence that we believed

3   Lester to be sleeping in, attempted to make contact by

4   verbal commands and commands over a PA system to exit the

5   residence.  When no answer was received, flash bangs were

6   utilized near the doorways of the residence.  It's a tactic

7   to get attention.  And in that time frame -- okay.

8   **Q.**   Sorry.  Let me ask you a follow-up question.  After the

9   flash bangs were used, what happened next?

10  **A.**   Lester stepped into the doorway of a residence across

11  the street from the residence we believed him to be in.

12  **Q.**   What was his demeanor like when he stepped out of the

13  residence that was across the street?

14  **A.**   Kind of irritated and confused.

15  **Q.**   Did S.W.A.T. agents and other officers give commands to

16  the defendant at that point?

17  **A.**   Yes.  Verbal commands and over a PA system.

18  **Q.**   What commands were given?

19  **A.**   To step out of the residence.

20  **Q.**   Did the defendant comply?

21  **A.**   No.

22  **Q.**   What did he do?

23  **A.**   He stood in the doorway.

24  **Q.**   And what did he say or do as he stood in the doorway?

25  **A.**   Was asking questions and noted that he was concerned of

1    two juveniles that were in the residence with him.

2    **Q.**   Did agents and officers continue to give him commands?

3    **A.**   Yes.  The commands were continued to be issued for

4    approximately 20 to 30 minutes.

5    **Q.**   Did S.W.A.T. agents on the scene take any other actions

6    to get the defendant to come out of his residence?

7    **A.**   A negotiator for the FBI was utilized.

8    **Q.**   What negotiator was utilized?

9    **A.**   Tim Roberts.

10   **Q.**   And what steps did Agent Roberts take when he was

11   brought to -- brought to the scene?

12   **A.**   Roberts utilized similar commands and attempted to

13   persuade Lester to exit the residence under the safety

14   standpoint for the children.

15   **Q.**   Can you describe the conversation the defendant had

16   with Agent Roberts?

17   **A.**   Roberts wanted Lester to step out of the building.

18   Lester wasn't sure, was uneasy about stepping out.  And they

19   mainly just focused on the concern for the children.  Lester

20   also mentioned being upset about the S.W.A.T. Team being

21   present, stated that -- "You could have just knocked on the

22   door to the serve the warrant."

23   **Q.**   At any point did the defendant leave the doorway of the

24   residence?

25   **A.**   Yes.  Briefly to retrieve a cell phone.

1    **Q.**   And he went back inside the residence?

2    **A.**   Yes.

3    **Q.**   And did agents and officers lose sight of him when he

4    went back into the residence?

5    **A.**   Yes.

6    **Q.**   And what did he do when he returned?

7    **A.**   We believe he made contact with his mother-in-law.

8    **Q.**   On a cell phone?

9    **A.**   Yes.

10   **Q.**   Did the defendant ultimately come out of the residence?

11   **A.**   Yes.

12   **Q.**   And how much time elapsed between the time that

13   S.W.A.T. began to effect the arrest and the defendant

14   complied with commands and came out residence?

15   **A.**   Approximately 20 to 30 minutes.

16   **Q.**   When he came out of the residence, what actions did law

17   enforcement officers on the scene take?

18   **A.**   They placed Lester in restraints but had to use ankle

19   restraints due to the size of his wrists.  He was also

20   placed in a bellyband, which -- similar fashion that

21   constricts the wrists to the waist.

22   **Q.**   Were handcuffs used on the defendant?

23   **A.**   Yes.

24   **Q.**   Can you describe how he was handcuffed?

25   **A.**   Lester was cuffed.  We later found out that the cuffs

1    were not double locked, which would prevent the cuffs from

2    being pushed through.  It prevents them from being

3    tightened.

4    **Q.**    So they were locked, just not double locked?

5    **A.**    Yes.

6    **Q.**    While the defendant was being secured at the scene,

7    what steps did Agent Roberts take next?

8    **A.**    He stepped in to check on the children.

9    **Q.**    And what did he observe when he stepped into the

10    residence to take care of the children?

11    **A.**    A house with children that had loose firearm ammunition

12    inside.

13    **Q.**    And how did he come to see the loose firearms of

14    ammunition?

15    **A.**    The children brought the ammunition to Roberts and

16    identified it.

17    **Q.**    And did they say anything to him as they handed him the

18    ammunition?

19    **A.**    They stated that it was -- this was a rifle round.

20    Similar statements to that.

21    **Q.**    So they identified the different types of ammunition?

22    **A.**    Yes.

23    **Q.**    Did Agent Roberts or any other agents or officers in

24    the house observe any firearms or gun safes?

25    **A.**    There was a safe.

1    **Q.**   Where was the safe?

2    **A.**   In the bedroom with the children.

3    **Q.**   Okay.  After the defendant was secured, where was he

4    transported?

5    **A.**   To Charleston.

6    **Q.**   Who transported him there?

7    **A.**   Special Agents Jared Jankowski and Genevieve Baushke.

8    **Q.**   Which agent drove?

9    **A.**   Jankowski.

10   **Q.**   Where was Agent Baushke sitting?

11   **A.**   Seated in the rear driver's side of the vehicle.

12   **Q.**   Where was the defendant seated?

13   **A.**   In the rear passenger side.

14   **Q.**   Next to Agent Baushke?

15   **A.**   Yes.

16   **Q.**   During the transport, as Agent Baushke was seated next

17   to the defendant, did she make any observations of what he

18   was doing?

19   **A.**   She observed a loose handcuff with Lester's right hand

20   placed over his left hand.  She described the left hand

21   being unrestrained.

22   **Q.**   And can you describe the loose handcuff that she saw?

23   **A.**   The handcuff had been pushed through or unhinged.  It

24   was unlatched.

25   **Q.**   And he was covering it with his hand?

1    **A.**    Yes.

2    **Q.**    How did Agent Baushke react when she saw that?

3    **A.**    She asked Lester how it happened.  Lester stated

4    S.W.A.T. didn't fully cuff him.

5    **Q.**    And what did Agent Baushke do next?

6    **A.**    She reached over and loosely secured the cuff.

7    **Q.**    Did she take any other actions after that?

8    **A.**    She also took a defensive posture in order to pin her

9    firearm against a part of the vehicle to limit access.

10    **Q.**    Did she continue to observe the defendant during the

11    ride?

12    **A.**    Yes.

13    **Q.**    And what physically did she see the defendant doing

14    during the remainder of the transport?

15    **A.**    Throughout the ride, Lester fidgeting, moving his hands

16    a lot, messing with the cuffs and also smirking.

17    **Q.**    How long was the transport to Charleston?

18    **A.**    Approximately an hour.

19    **Q.**    And specifically where did they bring him in

20    Charleston?

21    **A.**    To the Charleston Resident Agency.

22    **Q.**    And that's the FBI office?

23    **A.**    Yes.

24    **Q.**    What happened after the agents brought the defendant to

25    the RA?

1  **A.**    Lester was taken out of the vehicle and placed in a

2  holding room inside the agency.

3  **Q.**    Did he leave the holding room at some point?

4  **A.**    He requested to use the restroom to which Jankowski

5  escorted him.

6  **Q.**    What happened when Agent Jankowski escorted the

7  defendant to the restroom?

8  **A.**    Lester approached the urinal inside the restroom.

9  Jankowski asked Lester if he needed a cuff removed in order

10 to use the restroom.  Lester stated he didn't need it and

11 removed his left hand from the cuffs by dislocating his hand

12 and sliding it out.

13 **Q.**    After the defendant was done in the restroom, did Agent

14 Jankowski bring him back to the holding room?

15 **A.**    Yes.

16 **Q.**    And what did Agent Jankowski do when they returned to

17 the holding room?

18 **A.**    Jankowski had Lester show Genevieve what he was doing

19 with the cuffs.

20 **Q.**    By Genevieve, do you mean Agent Baushke?

21 **A.**    There -- sorry.  Baushke.  I apologize.

22 **Q.**    How did Agent Baushke react when she saw what the

23 defendant did?

24 **A.**    She was surprised and said something along the lines,

25 "Well, it's a good thing you didn't do anything on the ride

1    because that could have resulted in more charges."

2    **Q.**    How did the defendant respond to that?

3    **A.**    Lester stated he considered it, but decided against it

4    because he thought he could beat the charges against him.

5    **Q.**    As the defendant and the agents continued to wait at

6    the RA, did they make any observations about the defendant's

7    wrists?

8    **A.**    Yes.  Baushke noticed redness and injuries similar to

9    the metal rubbing against the wrist of the handcuffs.

10    **Q.**    And did she know when or how that occurred?

11    **A.**    No.

12    **Q.**    And, again, during the transport, was the -- did she

13    observe the defendant moving and fidgeting his hands?

14    **A.**    Fidgeting and moving, yes.

15    **Q.**    While the agents and the defendant were waiting in the

16    holding room at the RA, did the defendant continue to speak

17    with the agents?

18    **A.**    Yes.  A few questions arose.

19    **Q.**    The defendant had questions for the agents?

20    **A.**    Yes.

21    **Q.**    What questions did he ask them?

22    **A.**    At one point, Lester asked Baushke which hand she was,

23    right or left handed.

24    **Q.**    Did he ask any other questions?

25    **A.**    He also asked if there was a follow or a chase car to

1    his transport vehicle.

2    **Q.**   And what was the agents' understanding about why the

3    defendant was asking about whether Agent Baushke was right

4    or left handed and whether there was a chase car?

5    **A.**   Baushke believed it to be an attempt to identify which

6    side her gun would be placed on and a chase car as to if an

7    escape were attempted to be made.

8    **Q.**   Now, you indicated you spoke with Agent Baushke

9    directly about this experience?

10   **A.**   Yes.

11   **Q.**   And what was her demeanor like as you talked to her

12   about this experience?

13   **A.**   When I spoke with Baushke she was visibly disturbed and

14   it bothered her, the incident.

15   **Q.**   When you say visibly disturbed, what made you think

16   that?

17   **A.**   She was shaking, uneasy.

18        MS. SISCARETTI:  Your Honor, I have no further

19   questions for this witness.

20        THE COURT:  Thank you.

21    Your witness.

22        MR. FAERBER:  Thank you.

23                        **CROSS-EXAMINATION**

24   **BY MR. FAERBER:**

25   **Q.**   Where's Agent Baushke?

1   **A.**   I don't know where she is today.

2   **Q.**   You're up here telling a story you've heard, correct?

3   **A.**   Based off interviews and witness statements.

4   **Q.**   You weren't present for any of this?

5   **A.**   Correct.

6   **Q.**   The FBI went to the wrong house?

7   **A.**   Correct.

8   **Q.**   And made big explosions and I'm assuming had guns

9   pointed at everybody?

10          THE COURT:  Time out just a second.

11      I cannot have witnesses in the audience trying to

12  testify by making motions to the Court.  If you're going to

13  do that, sir, you're going to step out, you understand?

14  It's this gentleman up here with the beard that -- bald

15  head.  If he makes any more motions, he's going out of the

16  courtroom.  You cannot testify.  If you want to testify,

17  speak to defense counsel and take the stand.

18      You may proceed.

19          MR. FAERBER:  Thank you, Judge.

20  **BY MR. FAERBER:**

21  **Q.**   So there were no guns in the house outside a safe?

22  **A.**   Correct.

23  **Q.**   Mr. Lester ultimately cooperated and came with the FBI?

24  **A.**   Correct.

25  **Q.**   He's absolutely correct that you could have knocked on

1    the door and served the warrant?

2    **A.**    Okay.

3    **Q.**    Could you?

4    **A.**    I don't know his thought process.  Legally, yes.

5    **Q.**    Were you able to walk to the door, knock on it and

6    serve the warrant?

7    **A.**    We could have, but it was the FBI's decision ultimately

8    not to.

9    **Q.**    Could have.  You've described these handcuffs issues,

10    right?  Like -- who's responsible for putting handcuffs on?

11    **A.**    The arresting officer or agent.

12    **Q.**    And you described a situation where you're alleging

13    that he could have escaped, right?

14    **A.**    Based off witness statements.

15    **Q.**    You're alleging he could have done something?

16    **A.**    Yes.

17    **Q.**    Could have fled, right?

18    **A.**    Potentially.

19    **Q.**    But he didn't, did he?

20    **A.**    Correct.

21    **Q.**    Stayed there and cooperated the whole time?

22    **A.**    Outside of the initial 20- to 30-minute period, yes.

23    **Q.**    You weren't there for that?

24    **A.**    I wasn't there for any of it.

25    **Q.**    What was the exact times on the 20- to 30-minute

1   period?

2   **A.**    That's why I used approximate times.  The arrest

3   started at 6:00 a.m.  Lester was in custody approximately

4   somewhere around 6:30.  We cleared the scene -- not we, but

5   agents cleared the scene maybe 15, 10 minutes before 7:00.

6   **Q.**    And that includes setting off explosives, going to the

7   wrong trailer, that includes everything?

8   **A.**    Yes.

9   **Q.**    Ultimately, he cooperated.  There were no issues.

10  **A.**    I wouldn't say no issues, but he cooperated, yes.

11             MR. FAERBER:  Thank you.

12             THE COURT:  Any redirect?

13             MS. SISCARETTI:  No, Your Honor.

14             THE COURT:  Thank you, sir.  You may step down.

15             THE WITNESS:  Thank you.

16             THE COURT:  Anything further on behalf of the

17  United States?

18             MS. SISCARETTI:  Yes, briefly, Your Honor.

19             THE COURT:  Please.

20             MS. SISCARETTI:  Your Honor, based on the

21  Government's proffer regarding the evidence in this case as

22  well as the testimony that was presented, the Government

23  submits that under all the circumstances, detention is

24  necessary to assure that this defendant -- to ensure the

25  appearance of this defendant, as well as the safety of other

1    people in the community.

2         Now, first, with regard to the factors to be

3    considered, the nature and circumstances of the offense

4    charged are particularly egregious.  Again, this defendant

5    has not been charged in connection with the underlying

6    assault, however, he took extensive actions to cover up an

7    egregious crime of violence that resulted in the death of an

8    inmate in order to shield other law enforcement officers

9    from liability for that crime.  And his obstructive conduct

10   continued up until October of this year, Your Honor, when he

11   gave false statements to FBI agents who were investigating

12   the circumstances of Q.B.'s death.

13        Now, regarding the weight of the evidence, I submit

14   that the specificity of the indictment suggests the strength

15   of the case as well as the fact that two people have pleaded

16   guilty in connection with this matter.

17        And regarding the history and characteristics of this

18   defendant, Your Honor, I submit the fact that he was not

19   just a sworn correctional officer, but a lieutenant at the

20   Southern Regional Jail speaks to the fact that -- of the

21   egregiousness and the disregard for the rule of law in this

22   case.  And regarding the nature and seriousness of the

23   danger to any person, the community posed by the person's

24   release, I also direct your attention to -- Your Honor's

25   attention to the testimony that was presented in which the

1    defendant first refused office -- fellow enforcement

2    officers' commands to come out.  He took approximately 20 to

3    30 minutes before he complied with commands he was given

4    from fellow officers.  He, during the transport while

5    sitting next to a federal law enforcement officer, slipped

6    his hand out of the handcuff.  He acknowledged later that he

7    was considering taking some action, but he wasn't sure if

8    there was a chase car there and was also asking probing

9    questions about whether or not -- what -- whether the agent

10   was right handed or left handed.  And I suggest that all of

11   this, Your Honor, indicates an egregious disregard for the

12   rule of law and submit that detention is necessary in this

13   case for all of these reasons.

14           THE COURT:  Thank you.

15       Mr. Faerber?

16           MR. FAERBER:  Judge, we agree with the Pretrial

17   Services Report that there's a set of conditions that can

18   assure the appearance of the defendant, the safety of the

19   community.  Always a little troubled when we're using the

20   allegations against the defendant, which he's presumed to be

21   innocent of.  The Government hasn't proven anything as the

22   basis for this.  You can look at Mr. Lester's entire life

23   and see why he's appropriate for release.

24       He graduated high school from Shady Spring.  He's been

25   in the district since he was in 10th grade.  Immediately

1    goes to work for the jail.  And he did.  He worked his way

2    up to a lieutenant.  And actually he was a unit manager or

3    director of inmate services.  Maybe even a little better

4    than a lieutenant, Judge.  Exemplary career at the jail.

5        And these are allegations.  You heard the testimony

6    that he said he'd beat these charges.  I'm troubled by that.

7    He has significant ties to the community, Judge.  Numerous

8    people here.  His wife, his mother, an uncle.  His Uncle

9    Tracy O'Neil (phonetic) stated that he would be a custodian

10   for him.  We think that the Court can limit contact with

11   anybody that the Court deems appropriate.  He can wear an

12   electronic monitoring bracelet.  We'll know where he is at

13   all time.

14       You know, I think the proof is in the field trials on

15   this allegation of he's a serious risk.  On October 20th

16   they send him a letter of -- a target letter.  We're going

17   to indict you.  He didn't run.  He's still right on Lester

18   Mountain when they go to arrest him.  You know, the FBI

19   chooses to do this dramatic fashion in its 20- to 30-minute

20   standoff.  Actually, I think the testimony leaned more to 20

21   or 30 minutes to arriving on the scene until Mr. Lester

22   comes with them.  People show up at your house and start

23   blowing things up at 6:00 in the morning, you're going to be

24   startled, which is the entire purpose of those percussion

25   grenades or whatever they are.  He's got his children in the

```
 1    house.  There's not loose guns.  The testimony is that he

 2    had an opportunity to do things because of the FBI's errors,

 3    the Government's errors and he didn't.  He exercised

 4    appropriate judgement.

 5        We think that his history, his ties to the community,

 6    his work, his life demonstrates that if the Court releases

 7    him on bail, he will appear and he'll abide by any

 8    conditions.

 9        No criminal history.  The only person that can say

10    maybe he is, is their allegations of intimidation here.  The

11    Court can restrict that contact.  The Court can put a

12    monitoring bracelet on him.  It can all be controlled,

13    Judge.  We think that the Court can fashion the terms and

14    conditions.  We will comply with the evaluation as suggested

15    by probation for mental health.  He will comply with that.

16    And the end of the day, Mr. Lester is just like the rest of

17    his life.  He's not going bother anybody in the community

18    and he's going to show up when the Court asks.

19        We'd ask that you release him on any terms and

20    conditions you deem appropriate, Judge.

21            THE COURT:  Thank you, Counsel.

22            MR. FAERBER:  Thank you.

23            THE COURT:  Any rebuttal from the United States?

24            MS. SISCARETTI:  Just briefly, Your Honor.

25        The Government wants to reiterate that Count 4 of the
```

1    indictment, it does specify that this defendant -- part of

2    the obstructive conduct included threatening a witness with

3    assault in addition to telling witnesses to lie.  And that

4    that obstructive conduct continued until just over about six

5    weeks ago, Your Honor.

6        In addition, just to correct the record as -- regarding

7    the witness's testimony.  The witness testified that it was

8    20 to 30 minutes before this defendant complied with law

9    enforcement officers' commands to come out of the house and

10    to -- in order to be arrested.

11                THE COURT:  Thank you, Counsel.

12        The question before the Court is, should the defendant

13    be released on bond?  The United States filed a motion for

14    detention and therefore has the burden to establish there

15    are no conditions or set of conditions reasonably to assure

16    his appearance at trial and the safety of others in the

17    community.

18        The Court has not heard any evidence that -- well, I

19    shouldn't say any evidence.  The Court does not believe the

20    Government sustained its burden and established the

21    defendant's a flight risk.  And therefore, the Court finds

22    that he's not a flight risk.

23        The question on danger to others in the community.  The

24    Court understands defense counsel's position that it's

25    unusual to rely upon the offense conduct to establish the

1    predicate for detention.  But it's not necessarily

2    completely prohibited either because the -- in this case,

3    the defendant has no criminal record, but the allegations in

4    the -- in the indictment are very detailed and very specific

5    and very troubling with regard to those allegations and the

6    result of -- other allegations against other defendants

7    resulted in the death of an inmate.

8         The question is, does that rise to the level of being

9    the -- to being a danger to others in the community by clear

10   and convincing evidence?  The allegations are that he

11   threatened to assault and attempted to intimate witnesses to

12   give false testimony.  The Court believes that that is

13   sufficient and serious enough.  And based upon the weight

14   and the strength of the Government's case so far, the Court

15   believes that that is sufficient enough to order that he be

16   detained pending the trial of this case.  So the Court's

17   going to order that he remain in custody and that he be

18   detained.

19        Is there anything further on behalf of the United

20   States at this time?

21              MS. SISCARETTI:  No, Your Honor.

22              THE COURT:  Anything further on behalf of the

23   defendant at this time?

24              MR. FAERBER:  No, Judge.  Thank you.

25              THE COURT:  All right.  The defendant will be

1    remanded to the custody of the United States Marshal

2    Service.  I'm going to remain in the courtroom.

3         (Proceedings concluded at 3:54 p.m., December 5, 2023.)

4    CERTIFICATION:

5         I, Amanda J. Pickens, Federal Official Court Reporter,

6    certify that the foregoing is a true and correct transcript

7    from the record of proceedings in the above-entitled matters

8    as recorded on December 5, 2023.

9

10        s/Amanda J. Pickens    December 19, 2023

11        Amanda J. Pickens, CCR, RPR
          Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25