## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## BECKLEY

**UNITED STATES OF AMERICA**


**v.**                                                          **CRIMINAL NO. 5:23-cr-00188-004**


**CHAD LESTER**


## SENTENCING MEMORANDUM OF THE UNITED STATES

On March 1, 2022, pretrial detainee Quantez Burks died on a cell floor at the Southern Regional Jail ("SRJ" or "the jail") after multiple correctional officers brought him to "blind spots" – areas that had no surveillance cameras – and beat him as punishment for his earlier attempt to leave his assigned pod. Soon after Burks took his last breath, defendant Chad Lester used his authority as an SRJ lieutenant and shift commander and, working with his subordinate officers, coordinated an extensive cover-up of the circumstances of Burks's death. As part of this cover-up, the defendant threatened his subordinate officers with violence and retaliation, added false statements to multiple officers' reports, instructed officers to give a false cover story to investigators, and personally gave false statements to investigators. Eighteen months after Burks's death, defendant Lester stuck to the false narrative that he helped create, relaying it to FBI agents in a voluntary interview. The defendant even stuck to the false narrative when he chose to testify before this Court, only to be proven false by the testimony of multiple witnesses and documentary evidence that included the audit histories of SRJ incident reports.

The defendant's extensive obstructive efforts to cover up Burks's death were egregious crimes. His actions were an attempt to keep the truth about Burks's death from his family and friends, compounding their profound loss of a loved one who was only 37 years old. The

defendant's actions were designed to shield fellow law enforcement officers, who were working under his supervision, from being held accountable for their crimes. On the defendant's watch, correctional officers killed a man, and the defendant tried to help them cover up their crimes. Through his conduct, the defendant violated the public's trust in the law enforcement system he had sworn to uphold. The sentence in this case should reflect the seriousness of the defendant's actions and send a strong message to the defendant, the Burks family, and the community: it does not matter who you are or what position you may hold. No one is above the law. The United States submits that a guidelines sentence would meet these goals.

1.  **Government Objection to the Application of USSG § 2A1.3**

The government has objected to the guideline calculation in the PSR, based upon the determination of the appropriate applicable cross-reference.

The government agrees with Probation that the guideline for the violations defendant Lester was convicted of – 18 U.S.C. §§ 1512(k), 1512(b)(3), and 1001 – is U.S.S.G. §2J1.2, which establishes a Base Offense Level of fourteen. §2J1.2(a). In addition, the facts at trial established that defendant Lester threatened to beat a witness if that witness "ratted" on his fellow officers to investigators, warranting an eight-level increase pursuant to U.S.S.G. §2J1.2(b)(1)(B). U.S.S.G. §2J1.2(b)(3) gives an additional two-level increase based upon the evidence that defendant Lester altered multiple incident reports that were submitted during the investigation into the use of force that resulted in Burks's death, bringing the Offense Level pursuant to §2J1.2 to twenty-four.

Since the offenses at issue here involved obstructing the investigation of criminal civil rights offenses in violation of 18 U.S.C. §§ 241 and 242, the applicable offense level should be determined using U.S.S.G. §2X3.1 as set forth in the PSR.[1] U.S.S.G § 2J1.2(c)(1). Section

---

[1] The defense objects to the application of U.S.S.G. §2X3.1 because Lester was not convicted of being an Accessory After the Fact. However, the offense of conviction does not determine the underlying offense for the purposes of the

2X3.1(a)(1) establishes a Base Offense Level that is six levels lower than the Offense Level for the underlying offenses, which here involve a conspiracy to violate the rights of another involving bodily injury and death, in violation of 18 U.S.C. § 241, and deprivation of rights under the color of law, in violation of 18 U.S.C. § 242. The guideline for violations of 18 U.S.C. §§ 241 and 242 is found in U.S.S.G. §2H1.1. In turn, §2H1.1(a)(1) sets forth the Base Level as the Offense Level from the guideline that is applicable to the underlying offense.

The government submits that, in determining the applicable guideline cross reference pursuant to U.S.S.G. §2H1.1(a)(1), Probation incorrectly relied upon §2A1.1(3), which is the guideline for voluntary manslaughter. The federal voluntary-manslaughter statute defines that crime as "the unlawful killing of a human being without malice ... [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). However, the assault that led to Burks's death was not committed during the course of a sudden quarrel or in the heat of passion. Instead, it was a premeditated act that resulted in Burks's death. Accordingly, the United States submits that the appropriate cross-reference is instead §2A1.1(2)(B), which is the provision for First Degree Murder.[2]

The Fourth Circuit has held that premeditation is established where the evidence shows that there was some appreciable time for reflection and consideration before execution of the act, and that such a period of time does not require the lapse of days, hours, or even minutes. *United*

---

cross-reference. *United States v. Dickerson*, 114 F.3d 464, 468 (4th Cir. 1997) (noting that "if the underlying offense always constituted the offense of conviction (for purposes of the cross-reference), perjurers would be able to benefit from perjury that successfully persuaded a grand jury not to indict or a petit jury not to convict"). *See also United States v. Greer*, 872 F.3d 790, 795-96 (6th Cir. 2017) (noting that a defendant's claim that he was not actually an accomplice was immaterial, as "[t]he point of the cross-reference is to punish more severely . . . obstruction of, prosecutions with respect to more serious crimes").

[2] The government initially objected to Probation's reliance on the voluntary manslaughter provision and argued that the First Degree Murder guideline should apply because the death resulted during the course of the commission of another felony (violations of 18 U.S.C. §§241, 242). As Probation noted in its response, neither of these felonies are listed in 18 U.S.C. §1111. However, the government submits that the First Degree Murder provision should still apply, based upon the premeditation involved in the fatal assault of Burks.

*States v. Sinclair*, 301 Fed.Appx. 251, 255 (4th Cir. 2008) (upholding the application of U.S.S.G. §2A1.1 based on the finding that premeditation existed where the defendant left a nightclub after an altercation, retrieved a gun, and returned several minutes later to shoot the victim). "While the amount of time for reflection may vary, it is the fact of deliberation, of second thought that is important." *Id.* Here, the co-defendants had time to reflect, consider their response, and choose their course of action.

Based upon the evidence established at trial, the officers' initial encounter with Quantez Burks after he attempted to push past an officer and leave C-pod on the morning of March 1, 2022, was indeed unexpected. However, after the officers subdued and restrained Burks in the C-pod sallyport, the sudden emergency was over and there was no longer any need to use force. Having fully resolved the incident, a group of approximately ten officers, including some of the co-defendants, chose to abandon their legitimate law enforcement objective and instead escort the handcuffed and compliant Burks from C-pod, down the hallway, around the corner, past empty interview rooms, and into an interview room that was a known "blind spot" at the jail. Multiple officers testified that that they knew that this blind spot was a common place for officers to bring inmates who engaged in misconduct, so that the officers could use unreasonable force against them as a form of unlawful punishment. Indeed, co-defendants and other officers testified that they had personally used the interview room and other such blind spots for this purpose, or they had seen other officers do so – and that, on March 1, 2022, they chose to walk Burks to the interview room to punish him, too. Inside the interview room and out of the view of the camera, Lester's subordinates punched, kicked, and knee-struck Burks in the head and about his body without any justification. They then brought him from the interview room, ultimately carrying him to a cell in

A-pod, where they used additional, unjustified force against a motionless, handcuffed man who posed no threat to them.

Under these circumstances, after Burks was restrained, the emergency ended and defendant Lester's supervisees had the opportunity to reflect and make choices – and they chose to bring the subdued, handcuffed Burks into an interview room to beat him as punishment, just as officers had beaten inmates there on prior occasions, and then further assaulted him in a second location. While the planning process was not a long one, the decision of co-defendants and other officers to assault Burks was still a premeditated one that warrants the application of U.S.S.G. §2A1.1. *See Sinclair*, 301 Fed.Appx. at 255 (finding that premeditation existed based upon the few minutes it took the defendant to retrieve his gun after an altercation at a nightclub).

Should the Court find that the conduct at issue here does not establish the requisite circumstances for the First-Degree Murder guidelines provision, the United States alternatively submits that the conduct establishes Second-Degree murder pursuant to U.S.S.G. §2A1.2. Under 18 U.S.C. § 1111(a), Second-Degree murder requires malice aforethought, which the Fourth Circuit has found "exists when the evidence demonstrates that the defendant acted with a heart that was without regard for the life and safety of others." *United States v. Slager*, 912 F.3d 224, 235-36 (4th Cir. 2019) (upholding the second-degree murder cross-reference in a § 242 case) (internal quotation and citation omitted). *See e.g.,*, *United States v. Coll*, 762 F. App'x 56, 61 (2d Cir. 2019) (upholding application of U.S.S.G. §2A1.2 in § 242 case in which correctional officer repeatedly kicked victim in the head "[e]ven if [the defendant] did not intend to kill or seriously injure [the victim]" because such conduct "clearly manifested a reckless indifference to whether [the victim] lived or died"); *United States v. McDougle*, 82 F. App'x 153, 157–58 (6th Cir. 2003) (defining malice aforethought to include "conduct that is reckless and wanton, and a gross

5

deviation from a reasonable standard of care, of such nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm") (internal quotation marks omitted).

Here, the evidence established at trial proved that the co-defendants here acted with malice aforethought in the assault of Burks because they acted without regard for his life or safety. *See Slager*, 912 F.3d at 235-36. As the co-defendants pleaded guilty to and testified at trial, they willfully using unreasonable force against the handcuffed Burks by punching him in the head, slamming his head against the metal table, kicking him, knee-striking him, failing to intervene in other officers' punches and kicks, and aiding and abetting one another in punching, kicking, and striking him, resulting in his death. *See Slager*, 912 F.3d at 235-36 (upholding application of §2A1.2 in a §242 case in which the defendant fired his weapon at an unarmed man who was fleeing); *see also United States v. Conatser*, 514 F.3d 508, 523 (6th Cir. 2008) (upholding application of second-degree murder cross-reference in § 242 case in which defendant punched victim in the head twice and encouraged a codefendant to beat victim); *McDougle*, 82 F. App'x at 158 (upholding application of U.S.S.G. §2A1.2 in §242 case in which defendants restrained victim and repeatedly punched him in the abdomen). Because the assault of Burks occurred after premeditation and with malice aforethought, the voluntary manslaughter provision should not apply.

## A. Sentencing Factors

The United States respectfully submits that a guidelines sentence is sufficient, but not greater than necessary, to promote the purposes of sentencing. 18 U.S.C. § 3553. Specifically, a guidelines sentence here is necessary to account for the nature and seriousness of the offense and the history and characteristics of the defendant, as well as the need for adequate deterrence, to

provide just punishment for the offense, and to avoid unwarranted sentence disparities among co-defendants. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6).

**(1)    The nature and circumstances of the offense.**

This Court must consider "the nature and circumstances of the offense … [and] the need for the sentence imposed… to reflect the seriousness of the offense." 18 U.S.C. § 3553. Sentencing courts in cases involving obstruction crimes have noted that the underlying offense not only impacts the guidelines, but also the section 3553 factors. *See United States v. Boyd*, No. 3:07-CR-3, 2008 WL 4963198, at *21–22 (E.D. Tenn. Nov. 18, 2008), aff'd, 640 F.3d 657 (6th Cir. 2011) (finding that "the more serious the underlying offense, the higher the guideline range for the crimes of accessory after the fact and misprision of a felony will be… [and t]he nature and circumstances of the underlying federal crime are accordingly taken into account by the Court in its review of the § 3553 factors"); *United States v. Williams*, No. 3CRIM. 3:06-00009, 2007 WL 4292774, at *1 (M.D. Tenn. Dec. 5, 2007) (finding that "[t]he sentence in a misprision case must be dependent, to some degree, upon the seriousness of the underlying felony that the defendant concealed. . . [w]hether this consideration is part of the computation of the advisory guideline range under the United States Sentencing Guidelines or considered by the court in examining the factors set out in 18 U.S.C. § 3553(a), the seriousness of that felony will be a part of the sentencing equation"). Accordingly, the seriousness of defendant Lester's convictions for obstruction of justice crimes should be assessed in light of the underlying death-resulting civil rights felony violation that was the object of his conduct.

Here, the crimes that defendant Lester conspired to cover up were inherently serious: federal offenses that resulted in the violent death of a thirty-seven-year-old man in the custody, care, and control of SRJ correctional officers. As the Supreme Court emphasized, public officials

convicted of civil rights violations "have done more than engage in serious criminal conduct; they have done so under color of the law they have sworn to uphold." *Koon v. United States*, 518 U.S. 81, 110 (1996). "The seriousness of section 242 crimes simply cannot be understated, as they harm far more than individual victims; society as a whole is harmed when those entrusted to protect the public and enforce the laws turn to lawlessness themselves." *United States v. Boone*, 110 F. Supp. 3d 909, 917 (S.D. Iowa 2015), *citing United States v. McQueen*, 727 F.3d 1144, 1157 (11th Cir. 2013) (finding a violation of § 241 to be a "particularly serious offense," and stating that the "evils against which this civil rights statute is directed especially include correctional officers who flagrantly beat inmates (and young ones at that) placed by the law in their charge."); *see also United States v. Rodella*, No. CR 14-2783 JB, 2015 WL 711941, at *50 (D.N.M. Feb. 5, 2015) ("A law enforcement officer's violation of the law is not comparable to an ordinary criminal's violation. Civil rights crimes go to the core of our system and endanger the entire structure of our government and are a threat to the republic.").

Because defendant Lester conspired with others to cover up an extremely serious offense, his crimes are also serious. Further, defendant Lester used – and misused – his role as an SRJ lieutenant to engage in his obstructive behavior, which was extensive and included actual and implied threats of violence and retaliation against fellow law enforcement officers. A guidelines sentence will properly reflect the seriousness of these offenses.

### (2) History and characteristics of the defendant

This Court must consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Defendant Lester's extensive law enforcement experience, his supervisory position, and his prior experience covering up fellow officers' uses of unreasonable force make his post-offense conduct concealing the assault that resulted in Burks's death all the more blameworthy.

Indeed, as the Fifth Circuit observed, "a defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor." *United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000), *citing United States v. Winters*, 174 F.3d at 486 (Sentencing Commission "applied greater not lesser sentences" for crimes committed by law enforcement officers). *See also United States v. Rybacki*, 96 F.3d 754, (4th Cir. 1996) (finding that the district court abused its discretion when it departed from the guidelines simply because the defendant was a law enforcement officer).

### (3)    Need for the sentence imposed to afford adequate deterrence

This Court must consider "the need for the sentence imposed … to afford adequate deterrence to criminal conduct" (A)(2)(b). "General deterrence ... is one of the key purposes of sentencing." *United States v. Medearis*, 451 F.3d 918, 920-21 (8th Cir. 2006). The need for general deterrence "is especially compelling in the context of officials abusing their power." *United States v. Hooper*, 566 F. App'x 771, 773 (11th Cir. 2014). As one court observed, in a decision reversing lenient sentences for corrections officers: "[t]he need for the criminal law to deter seems especially compelling here. Prison inmates serve their sentences under the pervasive control of the corrections staff. . . Indeed, they may turn only to corrections officers for protection from beatings by other inmates, let alone from punitive beatings sustained at the hands of the officers themselves." *McQueen*, 727 F.3d at 1158.

The government submits that general deterrence considerations should apply to defendant Lesters's convictions for obstructing justice in an investigation of civil rights violations, particularly considering the difficulty in investigating these offenses in the correctional setting and holding offenders accountable. Abuses by prison guards are difficult to uncover precisely because some officers are willing to conceal and lie about such crimes, as defendant Lester did and as he

instructed multiple other officers under his command to do. *See McQueen*, 727 F.3d at 1158–59 ("The ability to unearth these crimes by law enforcement officers in a prison setting is particularly difficult, and, as we see it, the extraordinarily lenient sentences in this case sap the goal of general deterrence."). Indeed, in this case, only one officer refused to give a false statement to investigators on the day that Burks was beaten – and after his shift that day, the witness never returned to SRJ, ultimately deciding against a career in law enforcement due to the events of that day.

Correctional officers contemplating covering up civil rights abuses may also feel that they, like the officers who commit civil rights crimes, are unlikely to be caught. Indeed, uncovering and proving the circumstances surrounding Burks's death required extensive government resources and the willingness of cooperating witnesses to testify against fellow correctional officers, which are circumstances that may not be present in many cases.

A just sentence therefore should impact the decision-making of those "who may be tempted to violate the law and their oath of office to protect themselves or their fellow officers from possible state or federal criminal investigations." *United States v. Ronda*, 455 F.3d 1273, 1302 (11th Cir. 2006); *United States v. Bresnahan*, 400 F. Supp. 3d 793, 803 (D. Minn. 2019) (sentencing probation officer to 30 months for false statement to the FBI and explaining that "[w]hen a corrupt officer receives too lenient a sentence … it sends a signal to other officers and public servants that they too can harm others for the sole purpose of serving their own ends."). Adequate deterrence can only be achieved when correctional officers who are caught obstructing justice in these challenging and serious cases face significant penalties.

**(4)    Need to avoid unwarranted sentence disparities with co-defendants**

A guidelines sentence for defendant Lester would also avoid unwarranted sentence disparities with his co-defendants. Seven other defendants have been convicted for their roles in

the death of Burks and now face potential sentences ranging from 120 months of incarceration for the less experienced and less culpable defendants, up to a period of 360 months for the most culpable and more experienced defendants. In contrast to Lester, these defendants accepted responsibility by pleading guilty, including some who did so well before the trial. A guidelines sentence for this defendant – who was a lieutenant and a shift supervisor when he coordinated and participated in the cover-up of the assault by the officers working on his shift – would avoid unwarranted sentence disparities in this case.

### B. Conclusion

Defendant Lester was an experienced lieutenant who used his experience and authority to cover up a violent, death-resulting assault of an inmate by correctional officers under his supervision, and he used threats of violence and retaliation to accomplish his goals. There is nothing about defendant or his conduct that warrants a downward variance from the advisory guideline; instead, nearly every factor this Court should consider under 18 U.S.C. § 3553(a) points to the importance of the significant sentence recommended by the guidelines. The United States therefore respectfully requests that defendant be sentenced to a period of incarceration within the guidelines range, with the sentences for all three counts of conviction to run concurrently.

### C. Time for Sentencing

The United States does not intend to present any witnesses at the sentencing hearing. The government anticipates that the victim's family will address the Court. The United States anticipates the hearing should last approximately one hour.

Respectfully submitted,

LISA G. JOHNSTON
Acting United States Attorney

By:

/s/Timothy D. Boggess
TIMOTHY D. BOGGESS
Assistant United States Attorney
WV State Bar No. 6768
110 North Heber Street
Beckley, WV 25801
Telephone: 304-253-6722
Fax: 304-253-9206
E-Mail: timothy.boggess@usdoj.gov


HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

/s/Christine M. Siscaretti
CHRISTINE M. SISCARETTI
Deputy Chief of Operations
NY Bar No.4327748
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 598-9605
E-mail: christine.siscaretti@usdoj.gov

CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "SENTENCING MEMORANDUM OF THE UNITED STATES" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 9th day of May, 2025 to:

S. Benjamin Bryant
Bryant Law WV
P.O. Box 1104
Clendenin, WV 25045
ben@bryantlawwv.com
O: (304) 590-4766

/s/Timothy D. Boggess
TIMOTHY D. BOGGESS
Assistant United States Attorney
WV State Bar No. 6768
110 North Heber Street
Beckley, WV 25801
Telephone: 304-253-6722
Fax: 304-253-9206
E-Mail: timothy.boggess@usdoj.gov

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

/s/Christine M. Siscaretti
CHRISTINE M. SISCARETTI
Deputy Chief of Operations
NY Bar No.4327748
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 598-9605
E-mail: christine.siscaretti@usdoj.gov