# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

UNITED STATES OF AMERICA,

v.                                        CRIMINAL ACTION NO. 5:23-cr-00188-4

CHAD LESTER

## MEMORANDUM OPINION

Behind prison walls, abuse often goes unchecked. Not so in this case. Here, correctional officers killed Quantez Burks. In response, Defendant Chad Lester attempted to cover up the violence and directed their fabrication of reports to conceal correctional officers' actions.

I write to observe that, as here, only the most severe cases of prison abuse come to light. My thirty years on the bench convince me that many instances of mistreatment remain buried beneath layers of bureaucracy and institutional protection. This not only harms the victims but also erodes public trust in the justice system.

I recognize that prisons are dangerous places. Reasonable responses to inmate misbehavior and violence are required. Correctional officers are empowered and obligated to maintain the safety of inmates and officers. However, it is the unreasonable use of force that violates the Constitution.

The explanations offered to explain unreasonable conduct by correctional officers and to conceal brutality carry no weight with me. The standard of human decency is required of everyone. Poor pay, lack of training, and underfunding are problems to be dealt with by the other branches of government and not excuses for unconscionable, inhumane, and unconstitutional treatment of those in custody of their government.

Failures by those in positions of power destabilize the rule of law. The framework for law-abiding behavior is found in the Constitution which guarantees certain freedoms to everyone, including the incarcerated. Prisons must not be places where cruelty thrives in the shadows. Instead, they should be institutions of accountability and rehabilitation. If abuse is allowed, a culture of lawlessness thrives.

When the government takes total control of a person's life, it assumes a profound responsibility to ensure humane treatment. Depriving someone of freedom is the sentence. No further cruelty can be justified. When cruelty is brought to light, as it was in this case, it must be punished.

I.  BACKGROUND

On March 1, 2022, Quantez Burks died in the state's custody at the hands of correctional officers. Federal law enforcement investigated the incident. A federal grand jury returned an indictment against six Southern Regional Jail ("SRJ") correctional officers[1] on numerous counts including: conspiracy to deprive Mr. Burks of his rights under the U.S. Constitution, deprivation of Mr. Burks's protections under the U.S. Constitution, failure to intervene to protect Mr. Burks, conspiracy to unlawfully interfere with an investigation of a federal offense, unlawfully interfering with a federal investigation, falsifying information with the intent to impede or obstruct a federal investigation, and making fraudulent statement to the Federal Bureau of Investigations as it investigated Mr. Burks's death. [ECF No. 4]. The 18-count indictment paints a grim picture of horrific abuse by uniformed officers tasked with upholding the rule of law within the jail walls.

Defendants Jacob Boothe and Ashley Toney pleaded to separate single-count informations. Boothe pleaded guilty to acting under color of law when he deprived Mr. Burks of his rights under

---

[1] Two other correctional officers have been separately charged, and those cases are in front of Chief Judge Frank W. Volk of the Southern District of West Virginia.

the U.S. Constitution in violation 18 U.S.C. § 242. Plea Agreement at 2, *United States v. Boothe*, No. 5:24-cr-123 (S.D. W. Va. Aug. 8, 2024), ECF No. 12. Boothe stipulated that he "knew that officers could not use unreasonable force to punish inmates" and that "officers had a duty to intervene to stop other officers from using reasonable force against inmates." *Id.* at 13–15. Nonetheless, Boothe failed to intervene while correctional officers assaulted and injured Mr. Burks, who was restrained, handcuffed, and posed no threat. *Id.* Toney pleaded guilty to violating the same statute for similar conduct. Plea Agreement at 13–16, *United States v. Toney*, No. 5:24-cr-124 (S.D. W. Va. Aug 8, 2024), ECF No. 10. Now, Boothe and Toney face up to 10 years in prison.

Defendants Mark Holdren, Corey Snyder, and Jonathan Walters also pleaded guilty for their respective parts in Mr. Burks's death. They all pleaded guilty to violating the same statute, 18 U.S.C. § 241, for conspiring to violate the rights of Mr. Burks that resulted in his death. [ECF Nos. 190, 206, 211]. Holdren stipulated that he delivered multiple unreasonable "knee-strikes" against Mr. Burks while he was restrained. [ECF No. 190, at 11–14]. Snyder's use of force included a chokehold that took Mr. Burks to the ground. [ECF No. 211, at 11–14]. Walters swung Mr. Burks forward and hit his head against a metal door, a use of force that he knew was unjustified. [ECF No. 206, at 11–14].

All three defendants knew that officers must not use unreasonable force to punish inmates—including pretrial detainees. [ECF Nos. 190, 206, 211]. Before Mr. Burks's death, defendants admitted to bringing other inmates to jail "blind spots," locations where there were no surveillance cameras. *Id*. There, the officers would "use unjustified force to punish" inmates and avoid accountability for their actions. *Id.* Now, under their plea agreements, those defendants face up to 30 years imprisonment.

Remaining is the Defendant in this case, Chad Lester. He is the only defendant that went to trial. At his trial, the jury heard evidence that SRJ correctional officers used "blind spots" to punish inmates with unreasonable force and avoid the consequences. Mr. Burks was taken to two different "blind spots," and he died as a result of the bodily injuries inflicted by correctional officers.

The jury also heard that the Defendnat, a Lieutenant in the jail, instructed lower-ranked officers to write false reports and relay false cover stories about the incident to investigators. The jury found the Defendant guilty on all three counts: (1) conspiracy to tamper with a witness in violation of 18 U.S.C. § 1512(k), (2) tampering with a witness in violation of 18 U.S.C. § 1512(b)(3), and (3) providing false information to FBI agents in violation of 18 U.S.C. § 1001.

This case illustrates the horrific conduct that is happening in our jails and prisons. Too often these unconstitutional abuses go unnoticed and unpunished. No more. Chad Lester is the first of six in my court who will face the penalties of his criminal conduct. Conduct that took the life of another human being. Conduct that affronted the Constitution.

## II.     SUPREME COURT PRECEDENT

The Constitution does not abandon those in prison.[2] Nor does the Constitution empower correctional officers to administer their own justice through physical violence. The Supreme Court has affirmed and re-affirmed this principle.[3]

The Eight Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This means that prison officials may not "use excessive physical force against

---

[2] *Wolff v. McDonnell*, 418 U.S. 555–56 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country."). Indeed, prisoners enjoy "substantial religious freedom under the First and Fourteenth Amendments," the right of "access to the courts," the right to be free from "invidious discrimination based on race" the protections under "the Due Process Clause," and the right to not be deprived of "life, liberty, or property without due process." *Id.* at 556.
[3] Margo Schlanger, *The Constitutional Law of Incarceration, Reconfigured*, 103 Cornell L. Rev. 357, 365–85 (2018) (reviewing Supreme Court jurisprudence permitting federal courts to assess prison conditions).

prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Amendment also obligates officials to "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care," and "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (collecting cases).

Pretrial detainees—those in the state's custody but not yet convicted—obviously maintain their rights under the U.S. Constitution. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). The Government may detain a person suspected of violating federal law, and the Government may even "subject him to the restrictions and conditions of the detention facility." *Bell*, 441 U.S. 535. But a pretrial detainee "cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015).

The brief review of Supreme Court jurisprudence here supports a simple human proposition. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Put another way, people are imprisoned *as* punishment not *for* further punishment.[4]

### III.  UNCONSTITUTIONAL ABUSE

I note that many have observed that prisons are rife with "countless everyday indignities that reinforce perceptions that prisoners are a lower class of people" who deserve everything they get. John J. Gibbons & Nicholas De B. Katzenbach, *Confronting Confinement*, 22 Wash. U. J.L. & Pol'y 385, 476–77 (2006) (reviewing the culture of prisons and the reform necessary for "our correctional facilities [to] serve the public's interests"). No doubt this is reinforced by the myriad

---

[4] Sharon Dolovich, *Cruelty, Prison Conditions, and the Eighth Amendment*, 84 N.Y.U L. Rev. 881, 908 (2009) ("In short, when convicted offenders are sentenced to time in prison, living in prison for that time under existing conditions is the punishment.").

restrictions on the incarcerated: life in concrete cells, strip searches, lack of privacy, monitored communication, limited access to basic needs, and uniforms "that mark them out as social pariahs." Sharon Dolovich, *Excessive Force in Prison*, 114 J. Crim. L. & Criminology 415, 426–27 (2024). Still, the "innumerable dynamics in the prison environment encourage COs to regard people in custody as both less than human and congenitally dangerous, and to feel—or at least to perform—deep hostility and contempt towards them." *Id.* at 435.

Whether this attitude is the impetus of or result of the American carceral system is debatable. But its origin is ultimately irrelevant in the face of blatant constitutional violations, such as those proved in this case.

Sadly, I agree with those who have concluded that American prisons are overcrowded bureaucracies that dissolve the difference between the jailed and the jailors such that the public develops "an institutionalized unwillingness to identify and reform systemic failures." Nicole B. Godfrey, *Creating Cautionary Tales: Institutional, Judicial, and Societal Indifference to the Lives of Incarcerated Individuals*, 74 Ark. L. Rev. 365, 376–77 (2021) (identifying three common traits of carceral facilities that made them ripe for disaster in the COVID-19 pandemic). That unwillingness allows a culture of lawlessness to fester, and the abuses to continue.

I have long observed that the prison system resists and often defies reform. It thrives in secrecy. Prisons are often out-of-sight and out-of-mind, built in remote locations, housing inmates far from their nearest family members. Laura Rovner, *On Litigating Constitutional Challenges to the Federal Supermax: Improving Conditions and Shining a Light*, 95 Denv. L. Rev. 457, 461 (2018). The secretive nature of prisons, including data reporting and media access, creates other barriers. *Id.* at 462–63; Andrea Craig Armstrong, *The Missing Link: Jail and Prison Conditions in Criminal Justice Reform*, 80 La. L. Rev. 1, 33 (2019) (arguing that in addition to more robust

reporting, incarcerated individuals' own experiences provide valuable insight into the realities of prison life). Finally, unconstitutional abuses in prison go unchecked without appropriate and standardized oversight. David C. Fathi, *The Challenge of Prison Oversight*, 47 Am. Crim. L. Rev. 1453, 1460 (2010) (decentralized American facilities have led to, at best, "ad hoc and haphazard" judicial remedies of only the most extreme abuses).

I regret that our society has seemed to grow comfortable with the idea that the incarcerated are less than human and undeserving of basic constitutional rights. Laura I. Appleman, *Pandemic Eugenics: Discrimination, Disability, & Detention During Covid-19*, 67 Loy. L. Rev. 329, 414 (2021) (arguing that a "legacy of eugenic thinking" created, especially during the COVID-19 pandemic, "a system of consistent neglect and discrimination against those individuals who are incarcerated, detained, institutionalized, disabled, living in long-term care homes, or under correctional control").

Public ignorance or institutional apathy must not be permitted to protect correctional officers who abuse their power. Scholars have observed that "[a]buse by staff in American prisons and jails is rampant. Correctional officers frequently assault and otherwise grievously injure incarcerated men and women." David M. Shapiro & Charles Hogle, *The Horror Chamber: Unqualified Impunity in Prison*, 93 Notre Dame L. Rev. 2021, 2024, 2026–36 (2018) (providing 23 examples of egregious assaults on inmates). This is evident in the data, and this case is but one flagrant example.

The Death in Custody Report Act of 2013 requires states to report the death of

> any person who is detained, under arrest, or is in the process of being arrested, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, State-run boot camp prison, boot camp prison that is contracted out by the State, any State of local contract facility, or other local or State correctional facility (including any juvenile facility).

34 U.S.C. § 60105(a). Between fiscal years 2020–23 there were 25,393 reported deaths, and the majority (15,915) occurred in prisons.[5] Half of the deaths are the result of natural causes, and more than 10% are the result of suicide. Almost another 10% (more than 2,000 people) are attributed to the use of force by law enforcement or correctional officers.[6] This number is likely an underestimation as nearly 17% of manners of death are reported as "unavailable" due to pending investigations or autopsies.[7]

Considering what I have already explained, it is no surprise that there are not hundreds of prosecutions of correctional officers each year. The judiciary, however, has dealt appropriately with the few cases that have been brought to light before the court. The following are illustrative.

Erin Sharma, a federal corrections officer, was sentenced to life in prison on charges related to the fatal assault of inmate Richard Delano.[8] A jury convicted Ms. Sharma after it heard evidence that she moved an inmate into the cell of another inmate who she encouraged to attack Mr. Delano.

After an eight-day trial, a federal jury found Rikers Island correctional officer Brian Coll guilty of violating the rights of inmate Ronald Spear.[9] The jury heard evidence that Mr. Spear had been restrained and was lying prone on the ground when Coll kicked him in the head repeatedly.

Illinois correctional officers were found guilty after a jury heard evidence that they seriously assaulted an inmate, failed to ensure the inmate received medical care, and then falsified

---

[5] U.S. Dep't of Just., *State Reported Deaths in Custody Interactive Tables*, https://bja.ojp.gov/program/dcra/reported-data (last visited May 15, 2025) (hereinafter "*State Reported Deaths*"). Compare this with the 65,057 state prisoners and 7,125 federal prisoners who died in custody from 2001–19. E. Ann Carson, *Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables*, U.S. Dep't of Just. (2021).
[6] Use of force includes any "death that results directly from the use of physical force by a law enforcement or corrections officer, including use of service weapon, taser deployment, physical restraint, Pursuit Intervention Technique (PIT) maneuver, or other means of force." *See State Reported Deaths*, at Table 2.
[7] *Id.* (defining "unavailable").
[8] U.S. Dep't of Just., *Former Federal Corrections Officer Sentenced to Life in Prison on Civil Rights Charges Related to Fatal Assault* (Oct. 26, 2009), https://www.justice.gov/archives/opa/pr/former-federal-corrections-officer-sentenced-life-prison-civil-rights-charges-related-fatal.
[9] U.S. Dep't of Just., *Brian Coll, Former Correction Officer at Rikers Island, Sentenced to 30 Years in Prison for the Beating Death of Inmate Ronald Spear* (Sept. 13, 2017), https://www.justice.gov/usao-sdny/pr/brian-coll-former-correction-officer-rikers-island-sentenced-30-years-prison-beating.

reports to cover up the assault.[10]

On May 5, 2025, a New York corrections officer pleaded guilty to manslaughter for the fatal beating of an inmate in upstate New York.[11] Corrections officer Christopher Walrath was one of six guards charged in connection to the inmate, Robert Brooks's, death. He admitted to assaulting Mr. Brooks, putting him in a chokehold, striking him, and lying to investigators.

Ten New York prison guards have been charged in connection with the beating and death of a 22-year-old inmate.[12] The indictment alleges that inmate Messiah Nantwi died from injuries "sustained in a series of beatings by guards that begin in his room and continued even when he was lying handcuffed on the floor of the infirmary."

### IV.     CONCLUSION

Today, I sentenced Chad Lester to 17 and a half years in prison for his participation in the crimes surrounding the killing of Quantez Burks. He will go to prison for his leadership in that criminal conduct.

This sentence will serve as notice to those who might abuse the trust placed in them: prison walls will not shield wrongdoing, and official authority will not excuse lawlessness. I will not hesitate to impose harsh but just punishments on those correctional officials who flagrantly violate the public trust. To society at large, let today's sentence underscore an unwavering truth—justice reaches even into the darkest corners of our institutions. Abuse of power is not excusable, and

---

[10] U.S. Dep't of Just., *Second Illinois Prison Guard Sentenced to 20 Years of Imprisonment Following Conviction for Civil Rights Deprivation Resulting in Bodily Injury and Death and Obstruction Charges*, (Mar. 21 2023), https://www.justice.gov/usao-cdil/pr/second-illinois-prison-guard-sentenced-20-years-imprisonment-following-conviction.

[11] Michael Hill, *Prison guard who helped beat cuffed New York inmate to death pleads guilty to manslaughter*, AP News (May 5, 2025, 2:32 PM), https://apnews.com/article/inmate-death-guilty-plea-robert-brooks-c4f0d1abfa3af3531347bb8be21a85f8.

[12] Michael Hill & Dave Collins, *NY prison guards beat an inmate to death then tried to cover it up, prosecutors say*, AP News (April 16, 2025, 8:49 PM), https://apnews.com/article/new-york-prison-guards-inmate-death-5ec50359f3168e7115028c26784fc0af.

accountability is not negotiable. This is the cornerstone of democracy, and I am committed to preserving it without compromise.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

The court further **DIRECTS** the Clerk to post a copy of this published Memorandum Opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: May 15, 2025

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE